**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Erica Cook,

    Plaintiff,                                      Case No. 1:18cv83

    v.                                                 Judge Michael R. Barrett

Federal Reserve Bank of Cleveland,

    Defendant.

**OPINION & ORDER**

This matter is before the Court upon Defendant Federal Reserve Bank of Cleveland's Motion for Summary Judgment. (Doc. 15). Plaintiff Erica Cook filed a Response in Opposition (Doc. 27); and Defendant filed a Reply (Doc. 28). Plaintiff was then granted leave to file a Sur-reply (Doc. 33).

**I.    BACKGROUND**

Plaintiff Erica Cook began her employment with Defendant Federal Reserve Bank of Cleveland on September 8, 2015. (Doc. 18-1, Erica Cook Dep., PAGEID# 915). Plaintiff worked as a Law Enforcement Officer, which required her to carry a firearm while on duty. (Id. at PAGEID# 917).

Plaintiff has suffered from migraines since 2004. (Id. at PAGEID# 932). In the early part of 2016, Plaintiff's migraines began to get worse. (Id. at PAGEID# 930). Plaintiff's migraines would vary in intensity. At times, Plaintiff would have to lay in bed in a dark room. (Doc. 18-4, Erica Cook Dep. PAGEID# 1081). However, at other times, Plaintiff would only have a mild headache. (Id.) Plaintiff was not able to predict whether a mild headache would turn into a more severe migraine. (Id. at PAGEID# 1081-82).

Plaintiff did not feel she could safely carry a firearm when suffering from these unpredictable migraines. (Id. at PAGEID# 1082).

On June 7, 2016, Plaintiff was given an oral notice for absenteeism. (Doc. 18-11). As part of Defendant's progressive disciplinary action, Plaintiff was notified that she had been absent a total of fifty-six hours since November 30, 2015; and an additional hour of absence prior to November 30, 2016 would result in her being placed on a written warning. (Id.)[1]

On June 16, 2016, Plaintiff sought treatment for her migraines from her primary care physician, Dr. Heidi Yount. (Doc. 18-2, Erica Cook Dep., PAGEID# 982). Dr. Yount wrote a "Work Note," which stated that Plaintiff may return to work with no restrictions on June 21, 2016. (Doc. 18-14).[2]

On June 20, 2016, Plaintiff called Dr. Yount's office because her migraines were getting worse and the medication Dr. Yount prescribed was not working. (Doc. 18-15). The next day, Plaintiff called Dr. Yount's office again and asked to be referred to a neurologist. (Id.) Plaintiff explained that her brother also has migraine headaches and a neurologist had performed a spinal tap on him to relieve the pressure. (Id.) While Dr. Yount noted that a spinal tap is not a common method to treat migraines, Dr. Yount's office sent the referral to the neurologist on June 22, 2016. (Id.) However, because that

---

[1]Defendant's attendance policy provides that over a rolling 12-month period, an employee will be placed on oral notice after incurring more than 48 hours of absence for illness or personal reasons; a written warning after incurring more than 56 hours; and placed on probation after more than 64 hours of absence. (Doc. 18-9, PAGEID# 1137). If an employee fails to meet the terms of probation, and there are no extenuating circumstances, the employee is subject to termination. (Id. at PAGEID# 1138).

[2]In a footnote in its summary judgment brief, Defendant states that Plaintiff never provided this note to it. (Doc. 15, PAGEID# 89). However, Defendant does not cite to evidence in the record to support this statement.

neurology group did not accept Plaintiff's insurance, later, on July 5, 2016, Dr. Yount's office sent the referral to the Neurology Department at Ohio State University. (Docs. 18-16, 18-17).

On the evening on June 20th, Plaintiff called Defendant and stated that she needed to be off work the next day because she had to have a spinal tap done. (Doc. 18-29, PAGEID# 1313).

On June 21, 2019, Plaintiff had a discussion with Deborah Keener, one of Defendant's Human Resources Generalists, about taking additional time off for her migraines. (Doc. 19-1, Deborah Keener Dep., PAGEID# 1353-54). Keener recalls that Plaintiff explained that she would need to have some type of procedure. (Id. at PAGEID# 1353). On that same day, Keener sent short-term disability ("STD") paperwork to Plaintiff by regular mail. (Id. at PAGEID# 1356; Doc. 18-22). In her cover letter, Keener stated that the documents must be returned by July 7, 2016. (Doc. 18-22).[3] Plaintiff faxed the STD paperwork to Dr. Yount's office on July 2, 2016. (Doc. 18-23). Plaintiff thought Dr. Yount had submitted the STD paperwork to Defendant on July 6th. (Doc. 18-2, PAGEID# 990).[4] However, Plaintiff later learned that Keener had not received her paperwork; and on July 8, 2016, Plaintiff called Dr. Yount's office inquiring about her short-term disability paperwork. (Doc. 18-17). Dr. Yount's office told Plaintiff that she needed to schedule a follow up visit because "we have nothing in the chart about [patient] not working." (Doc.

---

[3] Plaintiff points out that Defendant does not have a policy requiring employees to return STD paperwork within fifteen days. In her deposition, Keener explained that the fifteen-day deadline mirrors the deadline for returning FMLA paperwork. (Doc. 19-1, PAGEID# 1360).

[4] It appears that Dr. Yount signed the STD form on July 6, 2016. (Doc. 18-25, PAGEID# 1217).

18-17). Plaintiff called again on July 12, 2016 about her disability forms. (Id.) That same day, Dr. Yount's office faxed the first page of the forms to Defendant. (Doc. 18-25). On the form, Dr. Yount did not answer question number five: "Does this condition render the employee incapacitated from doing his/her job?" (Doc. 18-25). However, Dr. Yount answered "no" to question number six: "Is the employee presently medically able to work." (Doc. 18-25). In response to the question, "[i]s this a chronic medical condition that may render the employee medically unable to work in the future," Dr. Yount responded "no." (Doc. 18-25). Dr. Yount wrote that she anticipated that Plaintiff would be able to return to work on September 6th, but it could be sooner. (Doc. 18-25). Dr. Yount explained that for Plaintiff to return to work, "[h]er migraine headaches must be under better control." (Doc. 18-25). Dr. Yount also wrote that Plaintiff was "awaiting neurology appt for additional treatment." (Doc. 18-25).

In a letter dated July 12, 2016, Defendant sent Plaintiff a written warning for attendance. (Doc. 18-12). The letter states that Defendant sent short term disability paperwork to Plaintiff on June 21, 2016, but Defendant had not "received any paperwork from [her] doctor to substantiate [her] absence." (Id.) The letter warned Plaintiff that she would face "additional disciplinary action," including termination, if she did not return to work on July 13, 2016. (Id.) Plaintiff did not receive this letter until after July 13th. (Doc. 18-2, PAGEID# 980).

On July 13, 2016, Keener faxed the STD paperwork back to Dr. Yount. In the cover sheet, Keener explains:

> I am faxing back the Short Term Disability paperwork you completed on Erica. We are seeking clarification to question #6. Based on the information on your faxed response we received this morning, the responses to question #6 are inconsistent with the information you provided. Please

4

confirm whether Erica is presently medically unable to work and what date she is or was able to return to work.

(Doc. 18-26, PAGEID# 1218). Dr. Yount returned the paperwork that same day with one revision. (Doc. 18-26, PAGEID# 1219). Dr. Yount answered "no" to question number five: "Does this condition render the employee incapacitated from doing his/her job?" (Id. at PAGEID# 1221).[5] Dr. Yount also included a handwritten note on the fax cover sheet stating:

> [Patient] was seen by Dr. Yount on 6-16-16. [Patient] was told she could return to work 6-21-16. [Patient] made decision to stay off work [due to] migraines being so bad and requested referral to neurology, but our office was not aware that she had not returned to work. She has a [follow up] appt for re-eval 7/15.

(Doc. 18-26, PAGEID# 1219). That same day, Plaintiff left a voicemail message for Keener explaining that she was aware that Dr. Yount's office had sent updated STD paperwork, but that there was a miscommunication between Dr. Yount and a nurse in her office. (Doc. 19-2, PAGEID# 1399). Plaintiff explained further that while Plaintiff was keeping the nurse updated, the nurse had not been communicating the information to Dr. Yount. (Id.)

On July 14, 2016, Plaintiff called Dr. Yount's office to ask about the disability forms. (Doc. 18-17). A message log showing the communication between Dr. Yount and her staff shows that Dr. Yount's staff told Dr. Yount that Plaintiff wanted to speak to Dr. Yount directly because she could lose her job. (Id.) Dr. Yount responded: "Our office never told her to stay off work, so the forms has [sic] been completed as I am to at this time. Will re-address her forms at her appt tomorrow." (Id.)

---

[5]In her deposition, Keener stated that these two answers were not consistent, and because of the inconsistency, she was confused about whether Plaintiff was able to work or not. (Doc. 19-1, PAGEID# 1398).

5

In a Progressive Disciplinary Action Form dated July 14, 2016, Defendant gave Plaintiff written notice that she had failed to meet the terms of her Written Warning; and she was being placed on probation for absences on July 13th and 14th. (Doc. 18-27). Plaintiff did not receive this form until after Defendant terminated her employment. (Doc. 18-3, PAGEID# 1032). However, Plaintiff was told about the notice in a phone conference that same day. The phone conference was with Keener, Mike Leber, James Duncanson, Janet Reed James. (Doc. 19-4, PAGEID# 1464). Duncanson was Plaintiff's immediate supervisor. Leber was acting manager of Cincinnati's Law Enforcement Unit. Keener told Plaintiff that if she did not return to work on July 15th, her employment would be terminated. (Doc. 18-3, PAGEID# 1034-35). Plaintiff asked if she could use vacation time, but was told no. (Doc. 19-4, PAGEID# 1464). Plaintiff stated that she would report to work the next day. (Doc. 19-2, PAGEID# 1414).

However, at 10:04 p.m. on the night of July 14th, Plaintiff called Defendant to say that she would not be in to work on July 15th. (Doc. 18-29, PAGEID# 1323). Later that night, at 11:52 p.m., Plaintiff was admitted to the Wayne Healthcare Emergency Department for a severe migraine. (Doc. 18-2, PAGEID# 999; Doc. 18-18).[6] Plaintiff called Defendant again at 12:48 a.m. and told the duty officer that she had just been released from the hospital. (Doc. 18-29, PAGEID# 1323). Plaintiff explained that she was disoriented due to a sedative she had been given so that she could not remember if she had already called. (Doc. 18-29, PAGEID# 1323). Plaintiff did not return to work on

---

[6]Defendant argues that the record from Plaintiff's visit to the emergency department states that this was the first migraine Plaintiff had suffered in the previous month. (Doc. 15, PAGEID#103). This is a mis-reading of this record. Under "History of Present Illness," the doctor explained that Plaintiff had a "[history of] migraines in 2010 – resolved, have no[w] returned the last 1 month." (Doc. 18-18, PAGEID# 1160).

6

July 15th. (Doc. 18-3, PAGEID# 1035).

Leber recommended that Defendant terminate Plaintiff's employment because she was absent on July 15th in violation of her probation. (Doc. 19-3, PAGEID# 1460).[7] Leber's recommendation was adopted. (Doc. 19-14, PAGEID# 1499). However, Leber never saw the STD paperwork sent by Dr. Yount; he was only told that there was incomplete information. (Doc. 20-1, Michael Leber Dep., PAGEID# 1563).

On July 15, 2016, Plaintiff saw Dr. Yount. (Doc. 18-20). Dr. Yount wrote a "Work Restriction" note stating that Plaintiff is not able to return to work at this time and she should remain off work through September 6, 2016. (Doc. 18-21). Dr. Yount also faxed the STD paperwork to Defendant on July 15, 2016. (Doc. 18-24, PAGEID# 1206). On question number five, Dr. Yount checked the box "yes" and indicated that her previous answer of "no" was an error. (Id.) Dr. Yount completed a "Certification" as part of the STD paperwork and stated that Plaintiff was not "[p]hysically capable of performing the essential functions of the job." (Id.) Dr. Yount stated that Plaintiff became incapacitated as a result of her condition on July 15, 2016. (Id.) When Plaintiff contacted Keener in September about returning to work, she was told that she was not eligible for re-hire. (Doc. 19-2, PAGIED# 1435).

Plaintiff claims a failure to accommodate in violation of the Americans with Disability Act, 42 U.S.C. § 12101, *et seq*. Defendant has moved for summary judgment on this claim.

---

[7]Leber drafted the message recommending Plaintiff's termination on July 14, 2016, the day before Plaintiff was absent from work in violation of her probation. (Doc. 20-1, PAGEID# 1576).

## II. ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether genuine factual issues exist, this Court must "draw all reasonable inferences in favor of the nonmoving party" without "mak[ing] credibility determinations or weigh[ing] the evidence"—indeed, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### B. ADA

The Americans with Disabilities Act, as amended by the Amendments Act of 2008 ("ADAAA"), makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"

unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case of failure to accommodate, plaintiff must show that: (1) he or she is disabled within the meaning of the ADA; (2) he or she is otherwise qualified for the position, with or without reasonable accommodation; (3) his or her employer knew or had reason to know about his disability; (4) he or she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). As part of this prima facie case, the plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007).

Unlike a disability discrimination claim premised on wrongful termination "because of disability," the burden-shifting framework set forth in *McDonnell Douglas* does not apply to a failure to accommodate theory. *Brumley v. United Parcel Serv.*, Inc., 909 F.3d 834, 839 (6th Cir. 2018). Instead, ADA discrimination "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)).

As the Sixth Circuit has recently reiterated, "[t]he ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Id.* Instead, "an employer must engage in an 'informal, interactive process' with the employee to 'identify the precise limitations resulting from the disability and potential reasonable

accommodations that could overcome those limitations.'" *Id.* (quoting *Kleiber*, 485 F.3d at 871). This "interactive process is mandatory and both parties have a duty to participate in good faith." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (quoting *Kleiber*, 485 F.3d at 871). "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* However, the failure to engage in the interactive process is not an independent violation of the ADA." *Keith v. Cty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013). Instead, as the Sixth Circuit has explained:

> the failure to engage in the ADA's interactive process "is actionable only if it prevents identification of an appropriate accommodation for a *qualified individual*." *E.E.O.C. v. Ford*, 782 F.3d at 766. As we have previously explained, when "the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim." *Williams*, 847 F.3d at 395.

*Cooley v. E. Tennessee Human Res. Agency, Inc.*, 720 F. App'x 734, 739 (6th Cir. 2017).

For the reasons which follow, the Court finds in this case that a genuine issue of material fact exists as to whether Defendant made a good faith effort to engage in the interactive process, and that a reasonable jury could conclude that Defendant has not met its burden to engage in an interactive process to determine whether an appropriate reasonable accommodation existed.

### 1. Disabled within the meaning of the ADA

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(B). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals...." 42 U.S.C. § 12102(4)(A).[8] Relevant in this case, the ADA provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

Plaintiff claims she is disabled due to her migraine headaches. Defendant maintains that Plaintiff was not disabled when her employment ended. Defendant explains that Dr. Yount did not clarify whether Plaintiff was incapacitated from working until the afternoon of July 15th, which was after Plaintiff failed to show for work that day. Defendant also argues that Plaintiff's phone records show that she was not disabled. Therefore, on one hand, Defendant takes the position that regardless of whether Plaintiff was actually disabled, Plaintiff did not provide the paperwork in the timeframe required by Defendant to show she was disabled. On the other hand, Defendant argues that there is

---

[8]The law governing the definition of "disabled" under the ADA has been recently altered:

> Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage ..., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject ... standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability ... should not demand extensive analysis." ADAAA § 2(b)(5).

*Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018).

11

evidence in the record that Plaintiff was not in fact disabled.

At the time the decision was made to terminate Plaintiff, Defendant had the following information:

- On June 16, 2016, Dr. Yount wrote a "Work Note," which stated that Plaintiff may return to work with no restrictions on June 21, 2016.  (Doc. 18-14).

- On June 21, 2019, Plaintiff informed Keener that she would need additional time off, and Keener sent STD paperwork to Plaintiff by regular mail.   (Doc. 18-22).

- On July 12, 2016, Dr. Yount's office returned the first page of the STD paperwork to Defendant.  (Doc. 18-25).  On the form, Dr. Yount answered "no" to question number six: "Is the employee presently medically able to work."  (Doc. 18-25).  Dr. Yount also wrote that she anticipated that Plaintiff would be able to return to work on September 6th, but it could be sooner.  (Doc. 18-25).  Dr. Yount also wrote that Plaintiff was "awaiting neurology appt for additional treatment."  (Doc. 18-25).  However, Dr. Yount did not provide an answer question number five: "Does this condition render the employee incapacitated from doing his/her job?"  (Doc. 18-25).

- On July 13, 2016, Keener faxed the STD paperwork back to Dr. Yount.  Keener asked for clarification on question number six and confirmation as to whether Plaintiff is presently medically unable to work.  (Doc. 18-26, PAGEID# 1218)

- That same day, Dr. Yount returned the paperwork and answered "no" to question number five: "Does this condition render the employee incapacitated from doing his/her job?"  (Doc. 18-26 at PAGEID# 1221).  Dr. Yount did not change her response stating that Plaintiff was not presently medically able to work.  Dr. Yount also did not change her response that Plaintiff would be able to return to work on September 6th.  In a note on the fax cover sheet, Dr. Yount stated that Plaintiff was told she could return to work on June 21, 2016 and her office was not aware that she had not returned to work.  (Doc. 18-26, PAGEID# 1219).  The note also states that Plaintiff has a follow up appointment on July 15, 2016.  (Doc. 18-26, PAGEID# 1219).  Plaintiff followed up with a voicemail message for Keener explaining that she was aware that Dr. Yount's office had sent updated STD paperwork, but that there was a miscommunication between Dr. Yount and a nurse in her office.  (Doc. 19-2, PAGEID# 1399).  Plaintiff explained further that while Plaintiff was keeping the nurse updated, the nurse had not been communicating the information to Dr. Yount.  (Id.)

Defendant attempts to use this confusion in the paperwork to demonstrate that Plaintiff was not disabled.  However, on July 15, 2016—the same day Defendant made

12

the decision to terminate Plaintiff—Dr. Yount faxed the same STD paperwork to Defendant a third time. (Doc. 18-24, PAGEID# 1206). This time, on question number five, Dr. Yount checked the box "yes" and indicated that her previous answer of "no" was an error. (Id.) In addition, Dr. Yount wrote a "Work Restriction" note that same day which states that Plaintiff is not able to return to work at this time and should remain off work through September 6, 2016. (Doc. 18-21).

Defendant questions the weight that should be given to this July 15th paperwork because Dr. Yount also stated on the form that Plaintiff became "incapacitated" as a result of her condition on July 15, 2016. (Id.) Defendant argues that this means Dr. Yount never stated that Plaintiff needed to be on leave between June 21 and July 15. However, Dr. Yount first signed the form on July 6, 2016, and at that time stated that Plaintiff was not "presently medically able to work." This discrepancy does not make it clear that Plaintiff did not become incapacitated until July 15th.

Defendant also points to Plaintiff's cell phone records, which according to Defendant, show that between June 21st and July 15th, Plaintiff was travelling throughout Southwest Ohio and Northern Kentucky; and also making and receiving phone calls. Defendant maintains that these phone records show that Plaintiff was able to work. However, as Plaintiff testified in her deposition, there were periods of time when she could not drive or use a phone, but at other times she could get out of bed and out of the dark room and be mobile. (Doc. 18-1, PAGEID# 934). Similarly, posts on Plaintiff's Facebook page do not demonstrate that Plaintiff was able to work between June 21st and July 15th. (Doc. 29-2). There is nothing in the June 21st post showing Plaintiff's daughter getting her hair cut and ears pierced indicating that Plaintiff was present. Moreover, Plaintiff

13

specifically testified that she was not with her daughter, but her mother was. (Doc. 18-3, PAGEID# 1049). Plaintiff explained that her mother tagged her in the post, which is why it appeared on her Facebook page. (Id.)

Therefore, the Court concludes that the evidence in the record creates a genuine issue of material fact as to whether Plaintiff was disabled.

### 2. **Otherwise qualified for the position**

As the Sixth Circuit has recently reiterated: "To be 'otherwise qualified' for the job, the employee bears the burden of showing she can perform the 'essential functions' of the job, with or without accommodation." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (citing 42 U.S.C. § 12111(8); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004)). "A job function is essential if its removal would fundamentally alter the position." *Id.* (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)).

Defendant disputes that Plaintiff was otherwise qualified for her position because she could not satisfy the attendance requirements of her position. Plaintiff responds that her attendance does not render her unqualified for the position, especially because the accommodation she was seeking was a temporary leave of absence to undergo treatment for the migraines responsible for her attendance problems.

The Sixth Circuit has held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998). However, Plaintiff claims that she would have been qualified for her position at the time of her termination if Defendant had granted her request for leave. The Sixth Circuit has

14

held that medical leave can constitute a reasonable accommodation under the ADA. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017) (citing *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998)). The Sixth Circuit has explained some of the factors to consider in determining whether a request for medical leave is a reasonable accommodation:

> This court has held that additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated "no clear prospects for recovery." *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000). A physician's estimate of a return date alone does not necessarily indicate a clear prospect for recovery, especially where an employee has repeatedly taken leaves of unspecified duration and has not demonstrated that additional leave will remedy her condition. *See Maat v. County of Ottawa*, 657 Fed.Appx. 404, 412–13 (6th Cir. 2016) (concluding that where an employee had already received substantial leave, additional leave was not a reasonable accommodation because her physician's vague estimate of a return date was uncertain and indicated that she might need further treatment); *Aston v. Tapco Int'l Corp.*, 631 Fed.Appx. 292, 298 (6th Cir. 2015) (concluding that additional leave was not a reasonable accommodation where an employee had already received a 26-week leave and had provided a physician's estimate of a return date, but had also submitted evidence that she still needed another medical procedure which would require recovery time beyond that date).

*Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017).

Here, Plaintiff had taken one or two days of leave per month in November of 2015 and continuing into January, April, May and June of 2016. (Doc. 18-11). When Plaintiff went out on June 16, 2016, she had a "Work Note" from Dr. Yount stating that she could return to work with no restrictions on June 21, 2016. (Doc. 18-14). However, because the medication Dr. Yount prescribed was not working, Plaintiff was not able to return to work on June 21st, and instead requested short-term disability leave. While there was confusion about the meaning of some of Dr. Yount's statements in the paperwork, it is undisputed that on July 6, 2016, Dr. Yount signed a form stating she anticipated that

15

Plaintiff would be able to return to work on September 6th, but it could be sooner if her migraine headaches were under better control. (Doc. 18-25, PAGEID# 1217). Dr. Yount also wrote that Plaintiff was "awaiting neurology appt for additional treatment." (Id.) On July 13, 2016, Dr. Yount returned the STD paperwork to Defendant a second time, and explained that Plaintiff had a follow up appointment on July 15th. (Doc. 18-26, PAGEID# 1219). Therefore, Plaintiff's situation was not one where she had already received substantial leave and was asking for additional leave. There was nothing in the paperwork or information Plaintiff provided to Defendant which indicated that Plaintiff had no clear prospects for recovery. Based on the statements of Dr. Yount, Plaintiff's condition was not chronic; and Plaintiff would be able to return to work on September 6th, or even sooner. In addition, Dr. Yount explained that Plaintiff was waiting for an appointment with a specialist; and Plaintiff was scheduled for a follow up appointment with Dr. Yount two days later on July 15th. Therefore, the record does not establish that Plaintiff's request for leave was unreasonable as a matter of law. *Accord Shepherd v. Honda of Am. Mfg., Inc.*, 160 F. Supp. 2d 860, 869 (S.D. Ohio 2001) (distinguishing *Walsh v. United Parcel Serv.*, 201 F.3d 718 (6th Cir. 2000) and concluding request for leave was reasonable accommodation where the plaintiff merely requested that she be granted twenty-five calendar day leave of absence in order to adjust her medication, but defendant terminated her before allowing her the opportunity to have her medical condition assessed).

Defendant also argues that because Plaintiff's migraines were unpredictable, she could not safely carry a firearm, which was one of the duties of a law enforcement officer. While carrying a firearm may have been one of the duties of a Law Enforcement Officer,

16

there is no evidence in the record that it was an "essential function" of the job. The ADA regulations provide that evidence of whether a particular function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions ...;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). As part of the STD paperwork, Defendant included an "Essential Functions Questionnaire" for the Law Enforcement Officer position. (See Doc. 18-24, PAGEID# 1209). While the Questionnaire lists a number of "essential functions," carrying a firearm is not among them.[9]

The Court concludes that there is a genuine issue of material fact as to whether Plaintiff was otherwise qualified for the Law Enforcement Officer position with the requested accommodation.

### 3. Employer knew or had reason to know about disability

Defendant does not appear to dispute that Plaintiff has established this element of the prima facie case.

---

[9]The only essential functions related to carrying a firearm include: "Able to wear a duty belt weighing approximately 11 lbs, around the waist;" and "Qualify and remain qualified with various firearms and intermediate weapons, including O.C. spray and expandable baton." (Doc. 18-24, PAGEID# 1209).

### 4. Employee requested an accommodation

Defendant argues that Plaintiff did not request an accommodation. Plaintiff explains that her requested accommodation was short-term disability leave.

The Sixth Circuit has explained that it has not established a "bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657–58 (6th Cir. 2016) (quoting *Judge v. Landscape Forms, Inc.*, 592 Fed.Appx. 403, 407 (6th Cir. 2014)). "Although a plaintiff need not use the word 'accommodate' or 'disability,' at a minimum he must 'make it clear from the context that [the request] is being made in order to conform with existing medical restrictions.'" *Id.* (quoting *Leeds v. Potter*, 249 Fed.Appx. 442, 449 (6th Cir. 2007)).

Here, Plaintiff informed Keener on June 21, 2019, that she needed to take additional time off in order to treat her migraines. On July 12, 2016, Dr. Yount's office faxed the first page of the STD paperwork to Defendant which explained that Plaintiff could return to work when her migraine headaches were under better control. Dr. Yount explained that she anticipated that Plaintiff's return to work date would be September 6th. (Doc. 18-25). Dr. Yount also explained that Plaintiff was "awaiting neurology appt for additional treatment." (Doc. 18-25). Based on this evidence in the record, the Court concludes that Plaintiff's request for short-term disability leave is sufficiently clear to constitute a request for an accommodation.

### 5. Employer failed to provide the necessary accommodation

There is no dispute that Defendant denied Plaintiff's request for STD leave and terminated her employment due to absenteeism. However, Defendant argues even if

such an accommodation was reasonable, it was not required to provide it. Defendant relies on the EEOC's Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under The Americans With Disabilities Act (ADA), which provides: "If an employee provides insufficient documentation, an employer does not have to provide reasonable accommodation until sufficient documentation is provided." The U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/policy/docs/guidance-inquiries.html#10 (last visited June 5, 2019).[10] Defendant argues that Plaintiff failed to report to work for nearly a month without sufficient medical basis for leave. However, the EEOC's Enforcement Guidance also provides: "if an employee provides insufficient documentation in response to the employer's initial request, the employer should explain why the documentation is insufficient and allow the employee an opportunity to provide the missing information in a timely manner." The Court finds that a genuine issue of material fact exists as to whether Defendant made a good faith effort as part of the interactive process in explaining why Plaintiff's documentation was insufficient and allowing Plaintiff an opportunity to provide the missing information.

Accordingly, Defendant Federal Reserve Bank of Cleveland's Motion for Summary Judgment (Doc. 15) is **DENIED**.

**IT IS SO ORDERED.**

                                                   */s/ Michael R. Barrett*
                                                   JUDGE MICHAEL R. BARRETT

---

[10] The Sixth Circuit has explained: "The Enforcement Guidance, while non-binding, 'constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 256 (6th Cir. 2011) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 812 (6th Cir. 2004) (en banc)).